IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 11-0143 |
| ) | |
| TYLON RAMON COUSIN, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION

Gary L. Lancaster,　　　　　　　　　　November 30, 2012
Chief Judge.

　　This is a criminal action. On June 28, 2011, a federal grand jury returned a four-count indictment against Tylon Ramon Cousin. Among the crimes charged were possession with intent to distribute 50 or more grams of cocaine base, commonly known as crack, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii), as well as possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Defendant pled guilty to the possession with intent to distribute count, but not guilty to the possession of the firearm count. This court held a bench trial on the firearm count and found him not guilty.

　　On September 14, 2012, defendant appeared before this court to be sentenced on the crack possession count. At that hearing, this court announced that it would diverge from the United

States Sentencing Commission's directive that an 18-to-1 ratio be applied to cocaine offenses during sentencing.

We write to explain why we are diverging from the Sentencing Guidelines. We also announce our intent to apply a 1-to-1 ratio to all future cases involving crack cocaine-related crimes.

I. FACTUAL BACKGROUND

Tylon Cousin was indicted on June 28, 2011 in a four-count indictment [doc. no. 1]. On March 22, 2012, he pled guilty to Count 2, which charged that he knowingly possessed with intent to distribute fifty grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Counts 1 and 3 were dismissed. Cousin requested a non-jury trial for Count 4, which charged that he possessed a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). On May 4, 2012, we held a bench trial and found Cousin not guilty [doc. no. 59]. Following that verdict, the only step remaining in Cousin's case was this court's imposition of sentence for the drug possession count.

In the written plea agreement, the parties stipulated that Cousin possessed a total of 135.1 grams of crack cocaine. Under the United States Sentencing Commission's Guidelines Manual

2

("the Guidelines"), Cousin's base offense level for this quantity of crack cocaine was 28. After the application of various upward and downward adjustments for specific offense characteristics and acceptance of responsibility, Cousin's total offense level was 27, a net reduction of one level. The Guidelines sentence range for this offense level based on Cousin's having a Category II criminal history is 78 to 97 months imprisonment.

By comparison, if Cousin had been convicted of possessing and distributing powder cocaine, his Guidelines sentence would have been approximately 50 to 60 months less. The base offense level for possession of 135.1 grams of powder cocaine (rather than crack cocaine) would be 18. Applying Cousin's net reduction of one level, his total offense level would have been 17 rather than 27. With a Category II criminal history, Cousin's Guidelines range would have been 27 to 33 months incarceration, an approximately 65 percent reduction in the term of imprisonment due solely to the fact that he possessed a solid form of cocaine rather than a powder form.

The difference between these sentence ranges is caused by the 18-to-1 ratio between crack and powder cocaine that the Guidelines presently use to calculate penalties for crack cocaine-related offenses. This ratio is basically an exchange rate: for sentencing purposes, one gram of crack cocaine equals

18 grams of powder cocaine. This conversion factor, which is commonly referred to as the "crack/powder disparity," inevitably results in longer sentences for drug offenses involving crack cocaine as compared to powder cocaine.

During his sentencing hearing, Cousin urged the court to reject this 18-to-1 ratio and instead calculate his sentence as if he had possessed powder rather than crack cocaine. The government objected to Cousin's request for a variance and expressed its agreement with the Guidelines' crack-to-powder ratio. After considering the matter thoroughly, the court granted Cousin's request for a variance. However, because Cousin's offense carries a statutory mandatory minimum sentence of 60 months, the court was constrained to impose that sentence rather than one falling within the reduced 27 to 33 month powder cocaine range.

## II. LEGAL STANDARD

A district court must follow a three step process when it sentences a criminal defendant: first, it must calculate the defendant's sentence under the Guidelines as if the Guidelines were mandatory; second, it must state on the record whether it is granting a departure and how that departure affects the Guidelines calculation; third, it must exercise its discretion by considering the factors relevant in 18 U.S.C. § 3553(a)

4

regardless of whether the court varies from the Guidelines sentence. U.S. v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006).

Section 3553(a) requires the court to impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to the defendant's criminal conduct, protect the public from the defendant's further crimes, and provide the defendant with means for rehabilitation. 18 U.S.C. § 3553(a). In considering the kinds of sentences available, the court must consult, but is not bound to apply, the advisory sentencing ranges set forth in the Guidelines. U.S. v. Booker, 543 U.S. 220, 246 (2005); U.S. v. Arrelucea-Zamudio, 581 F.3d 142, 145 (3d Cir. 2009) (it is procedural error for a district court to treat the Guidelines as mandatory).

The district court possesses significant discretion when it performs the third step of this process and is permitted to vary from the Guidelines. In calculating a sentence for a defendant convicted of a crack cocaine-related offense, the district court may "determine that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, *even in a mine-run case.*" U.S. v. Spears, 555 U.S. 261, 263 (2009)(quoting U.S. v. Kimbrough, 552 U.S. 85, 91 (2007))(emphasis in original). Therefore, "with respect to the

5

crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is not suspect." Spears, 555 U.S. at 264. The district court thus possesses the "authority to vary from the crack cocaine Guidelines based on [a] policy disagreement with them," and may do so "categorically" in sentencing all defendants who appear before it for crack cocaine-related offenses. Id. at 265-66.

In varying from the Guidelines, the court is not required to make an "individualized determination that [the Guidelines] yield an excessive sentence in a particular case." Id. at 265. It may simply take the stance that the sentence ranges set forth in the Guidelines, which are predicated on the theory that crack cocaine offenses should be more severely punished than powder cocaine offenses, are improper. Id. at 267. If a district court choses to categorically depart from the Guidelines, it is permitted to adopt a "replacement ratio" which, in its judgment, corrects the disparity contained in the Guidelines. Id. at 265.

III. DISCUSSION

  A. History of the Crack-Powder Cocaine Disparity

      As the Supreme Court has noted,

> "[c]rack and powder cocaine are two forms of the same drug. Powder cocaine, or cocaine hydrochloride, is generally inhaled through the nose; it may also be mixed with water and injected. Crack cocaine, a type of cocaine base, is formed by dissolving powder cocaine and baking

6

> soda in boiling water. The resulting solid is divided into single-dose 'rocks' that users smoke. The active ingredient in powder and crack cocaine is the same. The two forms of the drug also have the same physiological and psychotropic effects, but smoking crack cocaine allows the body to absorb the drug much faster than inhaling powder cocaine, and thus produces a shorter, more intense high. Although chemically similar, crack and powder cocaine are handled very differently for sentencing purposes."

Kimbrough, 552 U.S at 94 (internal citations omitted).

The crack/powder disparity has been subject to scrutiny since it was first incorporated into the Guidelines by the Anti-Drug Abuse Act of 1986. U.S. v. Williams, 788 F.Supp.2d 847, 859 (N.D. Iowa 2011) (the author of this opinion, Judge Mark W. Bennett, is a leading critic of the disparity). Congress justified the disparity, which was at that time 100-to-1, by invoking the conventional wisdom at the time that crack was inherently more hazardous and addictive than powder and that the correlation between crack cocaine use, drug distribution, and the commission of other serious and violent crimes was greater than that observed with other drugs. Id. at 857-58.

### 1. Evidence Does Not Support the Crack-Powder Cocaine Disparity

While there is absolutely no doubt that crack cocaine is a dangerous drug, the passage of time has proven that Congress's heightened fears about its dangers were unfounded. Id. At various times over the last ten years, the Sentencing Commission

7

has reported to Congress that crack is associated with significantly less drug trafficking-related violence than previously assumed, that the negative effects of prenatal crack cocaine exposure are identical to the negative effects of prenatal powder cocaine exposure, that the epidemic of crack cocaine use by youth never materialized to the extent feared, and that the crack/powder disparity produces sentences that are greater than necessary in light of the purposes of sentencing set forth in section 3553(a). Kimbrough, 552 U.S. at 97-8, 110.

The Department of Justice now agrees with the Sentencing Commission's observations. In 2009, the Department publicly stated that it

> "cannot ignore the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science, including evidence that crack is not an inherently more addictive substance than powder cocaine. We know of no other controlled substance where the penalty structure differs so dramatically because of a drug's form. Moreover, the Sentencing Commission has documented that the quantity-based cocaine sentencing scheme often punishes low-level crack offenders far more harshly than similarly situated powder cocaine offenders . . . The impact of these laws has fueled the belief across the country that federal cocaine laws are unjust."

Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the Subcomm. On Crimes and Drugs of the S. Comm. On the Judiciary, 111th Cong. 1 (2009)(Statement of Lanny A. Breuer, Assistant Attorney Gen. of

8

the Criminal Division, United States Department of Justice, at 9).

Several recent contributions to the medical literature further dispel the notion that crack cocaine is inherently more dangerous than powder cocaine. These studies attribute any increased violence associated with crack cocaine to the social and economic factors that surround crack cocaine markets. In 2010, investigators at St. Louis University conducted the largest known national epidemiological study examining the association between crack cocaine use and violent behaviors. Michael G. Vaughn et al., *Is Crack Cocaine Use Associated with Greater violence than Powdered Cocaine Use? Results from a National Sample*, AM. J. DRUG AND ALCOHOL ABUSE, 36:181-186 (2010). Their findings indicate that "[c]ocaine, regardless of the form in which it is used, has been associated with violence" and "the greater propensity of crack cocaine users to commit violent acts compared to powder cocaine users does not appear to derive from their use of different forms of cocaine." Id. at 181, 184. The investigators concluded that "[i]t is important that policy debates surrounding illicit drug use and violence draw distinctions between the psychopharmacological effects of the substance and the effects involving global and local markets where violence is associated with a host of other factors such as cost, distribution competition, and availability of weapons

that have little to do with the effects of the substance on the user." Id. at 185.

As an aside to policymakers, the investigators noted "[t]he substantial attenuation of the association of crack cocaine use with violence after adjustment suggests that the sociodemographic characteristics, mood and non-cocaine substance abuse disorders that make some individuals more likely to use crack cocaine than powder cocaine, are perhaps responsible for the increased prevalence of violence observed among crack users, rather than crack itself, compared to powdered cocaine users." Id. Investigators in Europe and the United Kingdom have reached similar conclusions. See e.g., Christian Haasen et al., *Relationship Between Cocaine Use and Mental Health Problems in a Sample of European Cocaine Powder or Crack Users*, WORLD PSYCHIATRY 4:3, 173-76 (October 2005) (multivariate regression analysis shows that the form of cocaine used is not by itself a predictor of higher mental health problems, whereas intensity of drug use, physical health, and social situation are); Michael Gossop et al., *Concurrent Use and Order of Use of Cocaine and Alcohol: Behavioral Differences Between Users of Crack Cocaine and Cocaine Powder*, ADDICTION 101, 1292-98 (2006)(crack cocaine users consume less alcohol during periods of cocaine use than powder cocaine users, and also consume less of both when they are used together than do powder cocaine users).

## 2. The Fair Sentencing Act of 2010 Partially Rejects the Crack-Powder Cocaine Disparity

In 2010, as part of the Fair Sentencing Act, Congress reduced the crack-to-powder ratio from 100-to-1 to 18-to-1. Congress declared that this new 18-to-1 ratio "reflects a bipartisan compromise that was reached in the Senate Judiciary Committee" in the interest of "political expediency." Williams, 788 F.Supp.2d at 847, 866. Apart from the need for a legislative compromise, Congress did not offer any substantive justification as to why it chose 18-to-1 over other ratios the Sentencing Commission has proposed over the past decade, such as 20-to-1, 5-to-1, and 1-to-1. Id.; U.S. v. Gully, 619 F.Supp.2d 633, 640 (N.D. Iowa 2009)(Bennett, J.).

The 2010 reduction was the first and only adjustment Congress has made to the ratio since it passed the Anti-Drug Abuse Act in 1986.

## B. This Court's Adoption of a 1-to-1 Replacement Ratio

Since 2010, the Guidelines have advised sentencing courts to use the reduced 18-to-1 ratio between crack and powder cocaine in imposing sentences for crack-related offenses. In percentage terms, this means that every quantity of crack cocaine is treated as if it were 1,800% more than its powder equivalent. Although this is far less than the 100-to-1 ratio (the equivalent of 10,000%) the Guidelines previously advised,

11

the amount of the reduction was not based on an empirical analysis of the various factors involved. Williams, 788 F.Supp.2d at 866. As stated previously, this reduced ratio was the result of "political expediency, not Congress's usual deliberative process." Id.

While we may give weight to the fact that the 18-to-1 ratio was the result of a longstanding (even if arguably incomplete) discussion between Congress and the agency charged with studying the issue, we are in no way obligated to apply it. Spears, 555 U.S. at 264; Kimbrough, 552 U.S. at 109. Instead, we ultimately retain discretion to apply whatever ratio we deem appropriate. Spears, 555 U.S. at 264; Arrelucea-Zamudio, 581 F.3d at 145.

In light of the evidence, we find that the Guidelines' current 18-to-1 ratio between crack and powder cocaine still contravenes section 3553(a)'s requirement that district courts impose sentences that are not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to the defendant's criminal conduct, protect the public from the defendant's further crimes, and provide the defendant with means for rehabilitation. Instead, we find that the evidence supports the application of a 1-to-1 ratio between crack and powder cocaine, effectively bringing the sentences for crimes involving these two drugs into complete parity. This

court will therefore use a 1-to-1 replacement ratio in imposing all future sentences involving crack cocaine-related offenses.

We are not the first court to apply a 1-to-1 ratio, either in this judicial district or the nation at large, and nor are we the first to apply it since the passage of the Fair Sentencing Act.[1] In applying the 1-to-1 ratio, Judge Cohill of this court aptly summarized the issue:

> "there are at least five distinct policy objections to a disparity – any disparity – between crack and powder cocaine sentences: (1) the current cocaine Guidelines 'do not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role; (2) the assumptions about the relative harmfulness of crack and powder cocaine have not been borne out by the evidence; (3) the crack/powder disparity tends to perversely punish lower-level dealers more harshly than major drug traffickers because imported powder cocaine is converted into crack at a lower level in the trafficking hierarchy; (4) the [Guidelines scheme] still improperly uses the quantity ratio as a proxy for various kinds of harm and violence that may or may not come with trafficking of crack cocaine in a particular case; and (5) the crack/powder disparity fosters disrespect for and mistrust in the criminal justice system because of its disproportionate impact on African American defendants."

---

[1] For cases using a 1-to-1 ratio in the Western District of Pennsylvania, see e.g. U.S. v. Wallace, Cr. No. 08-416 (W.D. Pa. 2009) (Bloch, J.), U.S. v. Simpson, Cr. No. 08-253 (W.D. Pa. 2009) (Conti, J.), U.S. v. Goggins, Cr. No. 08-226 (W.D. Pa. 2010) (Diamond, J.), U.S. v. Hewston, Cr. No. 07-356 (W.D. Pa. 2010) (Schwab, J.), and this court in U.S. v. Dow, Cr. No. 08-0418 (W.D. Pa. 2010). For the use of 1-to-1 in other judicial districts, see e.g. U.S. v. Gully, 619 F.Supp.2d 633 (N.D. Iowa 2009), U.S. v. Henderson, 660 F.Supp.2d 751 (E.D.La. 2009). For the use of 1-to-1 after the Fair Sentencing Act, see U.S. v. Williams, 788 F.Supp.2d 847 (N.D. Iowa 2011).

U.S. v. Russell, 2009 WL 2485734, at *2-3 (W.D. Pa. 2009)(quoting Gully, 619 F.Supp.2d at 639, 641).

Going forward, this court will sentence defendants convicted of crack-related offenses as follows: first, we will calculate the applicable sentence range under the Guidelines precisely as we would have done if the Guidelines were mandatory; second, we will rule on the motions of both parties and state on the record whether we are granting a departure and how this departure affects the Guidelines calculation; third, we will vary from the Guidelines range and calculate a sentencing range using a 1-to-1 ratio between crack and powder cocaine, at which time we will also consider the additional relevant section 3553(a) factors in determining the appropriate sentence to impose.

In cases involving a statutory mandatory minimum sentence that is higher than the Guidelines range under a 1-to-1 ratio, we will impose the mandatory minimum sentence. This process is consistent with the sentencing procedure that our court of appeals requires district courts to perform. See Arrelucea-Zamudio, 581 F.3d at 146 (quoting Gunter, 462 F.3d at 247).

### C. Calculation of Tylon Cousin's Sentence

We will now explain how we determined Cousin's sentence according to the procedure described above. First, we

calculated Cousin's base offense level using the 18-to-1 disparity set forth in the Guidelines. According to Guideline §2D1.1(c)(6), the base level for an offense involving 135.1 grams of crack cocaine was 28. Cousin then received a 2 level enhancement for possessing a firearm at the time of his arrest, followed by a 3 level downward adjustment for acceptance of responsibility. See SENTENCING GUIDELINES MANUAL §§ 2D1.1(b)(1), 3E1.1(a)-(b). This produced a total offense level of 27, which based on Cousin's Category II criminal history yielded a Guidelines sentence range of 78 to 97 months incarceration.

Second, noting that the parties have not moved the court to grant any departures, the court did not grant any in this case.

Third, in accordance with our new policy, we varied from the Guidelines and calculated Cousin's sentence as if he possessed powder cocaine. We find that this is necessary to fulfill section 3553(a)'s mandate that a court impose a sentence sufficient but not greater than necessary to achieve the section's goals. The base offense level for 135.1 grams of powder cocaine under Guideline §2D1.1(c)(11) was 18. Applying the 2 level enhancement for the possession of a firearm and 3 level downward adjustment for acceptance of responsibility, Cousin's total offense level fell to 17 according to the 1-to-1 ratio. Based on his Category II criminal history, Cousin's Guidelines sentence was 27 to 33 months imprisonment. The court

notes that this defendant is in need of drug rehabilitation assistance as well as vocational training, and recommends that he receives both during his incarceration.

Although Cousin's adjusted Guidelines range is 27 to 33 months incarceration, section 841(b)(1)(B) dictated a mandatory minimum sentence of 60 months because Cousin possessed more than 28 grams of cocaine base. 21 U.S.C. § 841(b)(1)(B). While the Guidelines are advisory, the statute is not. Therefore, we sentenced Cousin to the statutory minimum of 60 months incarceration.

## IV. CONCLUSION

For the foregoing reasons, the court sentenced Tylon Ramon Cousin to 60 months incarceration.

BY THE COURT,

_____, C.J.